DeSimone *v.* Philadelphia, Appellant.

138

Argued November 19, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*I. Jerome Stern,* Assistant City Solicitor, with him *Jerome J. Shestack,* First Deputy City Solicitor and *Abraham L. Freedman,* City Solicitor, for appellant.

*David Berger,* with him *Leon H. Kline,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 3, 1955:

The City of Philadelphia maintained in 1949 at 12th and Reed Streets a swimming pool which was 80 feet long, 40 feet wide and ranged from a wading shallowness at one end to a depth of over 5 feet at the other end. On Tuesdays, Thursdays and Saturdays the pool was reserved for boys; on Mondays, Wednesdays and Fridays, girls had it for their exclusive use. A lifeguard attended on the boys' days but not on girls' days.

To this pool on Wednesday, June 29, 1949, came some 50 girls for relief from the heat of a glowing summer's day and for the general enjoyment and fun that people, particularly the young, find in the popular sport of swimming. Among the gay children in the water at about 1 o'clock of the afternoon was Anna Jean DeSimone, 15 years of age, accompanied by her sister, Alice DeSimone, 10 years of age. While the younger child waded at the shallow end, Anna Jean swam in the deeper area of the basin. Another swimmer, Dolores Capaldi, 14 years old, was playing in the superficial waters when she heard shouts coming from the opposite end of the pool. Climbing a ladder to the pavement, she ran to the scene of the alarm and there saw Anna Jean helplessly floating and obviously in serious difficulty. She dived toward her stricken companion while another girl, Anna May Hoffman, joined in the attempted rescue. Between them they bore the drowning child to the edge of the pool and on to the cement apron. As the rescued girl lay on the pavement moans rose from her lips, her eyelids fluttered and bubbles escaped from her mouth and nose.

Having had, in years past, some slight instruction at school in artificial respiration, Dolores attempted to apply the vague remnants of her knowledge to the task of resuscitating the prostrate Anna Jean. Anna May, equally an amateur, assisted Dolores in this heroic effort. By turns they pressed the inert body, lifted the arms and blunderingly sought to renew the breathing which had now ceased. A third person, referred to only as Mario, also gave a hand. When Anna Jean was finally taken to the hospital, arriving there at 2:45 P.M., she was pronounced dead.

The parents, as administrators of the estate of the deceased girl, and in their own right, brought suit against the City of Philadelphia and, at the ensuing trial, the jury returned a verdict in their favor in the sum of $3500 in the Wrongful Death Action and $15,000 in the Survival Action.

The defendant City moved for a new trial and for judgment n.o.v. Both motions were refused and this appeal followed. Counsel for the defendant urges a reversal of the judgments on the representations that the plaintiffs failed to prove that the City was negligent and that the City, acting in furtherance of the governmental purposes of the City, is immune from tort liability.

In the very recent case of *Hill v. Allentown Housing Authority*, 373 Pa. 92, this Court said: "In Honaman v. Philadelphia, 322 Pa., 535, 185 A. 750, it was held that in maintaining parks and playgrounds *a city acts in its proprietary capacity and is therefore liable for failure to exercise reasonable care;* there was cited with approval the statement from 2 Dillon, Mun. Corp. 3rd ed. §985 that '—municipal corporations, are liable, for the improper management and use of their property, to the same extent and in the same manner as

private corporations and natural persons.'" (Emphasis supplied.)

Acting in its proprietary capacity in maintaining and operating the swimming pool involved in this litigation, the City of Philadelphia was therefore required to exercise due care under the circumstances. In *Paraska v. Scranton,* 313 Pa. 227, we said: "Where a city undertakes to manage and supervise property, such as public parks and playgrounds, it must take care to keep that property in a reasonably safe condition for those invited to come upon it, and this is particularly true in the case of children in playgrounds."

In *Styer v. Reading,* 360 Pa. 212, 215, we said: "A municipality is not an insurer of the safety of children playing on its public playgrounds. However, *it is well settled that in maintaining parks and playgrounds a city must exercise reasonable care.*" (Emphasis supplied.)

Did the City of Philadelphia exercise reasonable care to protect from harm the children invited to swim in the pool which it maintained? That was the question presented at the trial and it was submitted to the jury, the only tribunal which, under the procedure in the case, could pass upon such a question of fact. In the *Hill* case already cited, we said further: ". . . where a city undertakes to manage and supervise property, such, for example, as a public park, it must exercise reasonable care to keep the property in reasonably safe condition for those who lawfully come upon it, *including the policing of it sufficiently to protect children from dangers in connection with their entrance and play thereon.*" (Emphasis supplied.)

Did the City, according to the standards set up in the *Hill* case, sufficiently police the pool to safeguard children from the dangers inherently attendant upon bodies of water? It is evident that the City recognized

the need of a lifeguard at the pool since one was installed on Tuesdays, Thursdays and Saturdays when the swimming facilities were enjoyed by boys alone. No explanation has been offered or possibly could be given, as to why there would be less need for lifeguards when girls, instead of boys, occupied the pool. The contrary might be more in keeping with common knowledge since, as a general observation, boys more naturally take to acquatic sports than girls.

Counsel for the City contends that the plaintiffs failed to show that the City did not have a lifeguard in attendance on the day of the tragedy. The undisputed evidence reveals that only two City employes were on duty at 12th and Reed on the day in question: an elderly lady who examined the feet of the girls before they entered the pool, and the caretaker or "janitor at the pool."

It is argued by the City that "there is no evidence or claim that defendant by its employes failed to rescue decedent promptly." This statement collides head-on with the facts. The record almost conclusively shows that not only did the defendant's employes not rescue decedent promptly, but it reveals that they did not even stretch out a helping hand to the struggling child. Moreover, even if they had bestirred themselves in this worthy endeavor, their efforts could only have been pathetically futile. The lady attendant, who was described as a "short, little lady with gray hair," was, according to one witness, 86 years of age. The janitor was fat, middle-aged and nervous. While Dolores and Anna May were engaged in their brave but hopeless efforts to save Anna Jean, the janitor Maleno (described as the "retired type,") was "running around like a chicken without a head."

Maleno was apparently ignorant as to the very first step to be taken in an emergency of the character

described. Alice DeSimone testified: "The girls were all telling him what to do." Dolores testified that Maleno "wasn't doing anything."

To allow without supervision children of a tender age to disport in a pool of such depth that the water immerses the head of a child standing on the bottom of the pool constitutes such lack of due care as will make the owner and maintainer of the pool responsible in damages for injury or death resulting from such lack of supervision. It is common knowledge that the water surrounding a swimmer may at any moment turn into a liquid coffin unless assistance quickly reaches him should he become helpless.

The plaintiffs called as a witness John A. Glascott, employe of the City's Department of Recreation, who testified that Ralph Maleno was rated in the civil records as a janitor. In cross-examination, defendant's counsel sought to ask the witness questions regarding Maleno's responsibilities and duties on June 29, 1949. Plaintiffs' counsel objected because the questions went beyond the scope of the direct examination. Nor was it evident that Glascott knew what Maleno's responsibilities and duties were on the day indicated. The Court sustained the objection. We see no error in this ruling, particularly in view of the fact that the Court on three different occasions advised defendant's counsel that he could call Glascott as his own witness. The defendant did not call Glascott or any other witness.

The official report submitted by Dr. B. Gouley, coroner's physician, declared that the cause of death was "Drowning with associated scalp bruise." The bruise referred to was not a serious one and did not contribute to the fatality. A Dr. Sidney Johnson testified that the "forceful application of the artificial respiration served to increase the shock in which the

girl was already in. And I feel that in my opinion that this was sufficient to cause the death of this girl." The City argues from this that the plaintiffs have "offered two irreconcilable and conflicting medical opinions, for one of which the defendant is clearly not liable." Defendant's counsel, however, does not indicate which opinion it is which would exonerate the City from responsibility for damages. The City also overlooks, with this contention, the rule that in reviewing evidence on motions for judgment n.o.v., the record is to be read in the light most favorable to the plaintiff. Thus, if either doctor's testimony supports the claim of recovery, the verdict must be upheld. But it is by no means apparent that the two doctors' opinions are contradictory.

When the child was removed from the pool she was still breathing, although it is evident that death was already knocking at the portal of her lungs. The amateurish resuscitating methods employed by her friends increased the shock and possibly stopped the heart a few beats before it would have ceased any way if no proper restorative methods were forthcoming. In either event the jury was warranted in finding the City negligent in that (1) it failed to properly police the pool, and (2) it failed to provide the services of a person trained to administer first aid or to supply equipment which could have been pressed into action for that purpose. The learned court below stated in its able Opinion: "The City errs in attempting a sharp distinction between drowning and improper artificial respiration as causal factors. Where one drowns while another simply looks on, the death is by drowning and by failure to apply artificial respiration; where artificial respiration is improperly applied and contributes to the death the cause of death may be described both ways without being conflicting versions."

The appellant City argues further that the verdicts rendered in the case are excessive. In *Scott v. American Express Co.*, 257 Pa. 25, we stated: "we have repeat-edly said that the question of the amount of the verdict would be reviewed only in cases where so grossly excessive as to shock our sense of justice, and where the impropriety of allowing a verdict to stand is so manifest as to show a clear abuse of discretion on the part of the court below in refusing to set it aside." The court below, which was in a better position than we are to appraise the monetary losses involved did not believe that the verdicts were so grossly excessive as to shock a sense of justice and we see no reason to interfere with the Court's view of the case in that respect. Anna Jean DeSimone was 15 years of age at the time of her death. Although still a student at high school she was skilled in designing and remaking clothes. If, before reaching the age of 18, she worked during the summer months and then embarked on full time employment after 18, it is not unreasonable to suppose that she could have given her parents (until she reached her majority) such a sum per week as would have easily made up the difference between $3500, the amount of the verdict in the Wrongful Death Action, and $541, the amount of the funeral expenses.

With regard to the Survival Action, it was agreed at the trial that at the time of her death, Anna Jean had a life expectancy of 50 years. Despite the high cost of living and inflationary spirals, it is not too much to anticipate that in a half century, an energetic, healthy woman can almost in any type of fairly re-munerative employment, accumulate $15,000.

Judgment affirmed.