CITY OF PHILADELPHIA, and John F. Street, in his official capacity as Mayor of the City of Philadelphia, Petitioners

v.

Edward G. RENDELL, in his official capacity as Governor of the Commonwealth of Pennsylvania and The Philadelphia Parking Authority, Respondents.

Commonwealth Court of Pennsylvania.

Argued March 2, 2005.

Decided Dec. 20, 2005.

See also 579 Pa. 591, 858 A.2d 75.

Eleanor N. Ewing, Philadelphia, for petitioners.

Susan J. Forney, Chief Deputy Attorney General, for respondent, Edward G. Rendell.

Alfred W. Putnam, Jr., Philadelphia, for respondent, Philadelphia Parking Authority.

BEFORE: COLINS, President Judge, and SMITH–RIBNER, Judge, and PELLEGRINI, Judge, and LEADBETTER, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Before this Court, in our original jurisdiction, are preliminary objections of Governor Edward G. Rendell and the Philadelphia Parking Authority (Authority) to a complaint filed by the City of Philadelphia and the Mayor of Philadelphia, John F. Street (collectively, City), challenging a recent amendment to what is commonly called the Parking Authority Law, 53 Pa.

C.S. §§ 5501–5517.[1] The core of the City's challenge to this statutory amendment is that it interferes with the City's home rule powers. It has already been determined by our Supreme Court that the Parking Authority Law is legislation extrinsic to the City's home rule powers and, thus, its amendment to transfer control of the Authority from the City to the Governor did not infringe upon the City's home rule powers. In this case, we consider whether another amendment to the Parking Authority Law, which extends the Authority's administration of on-street parking in Philadelphia for ten years, requires a different conclusion.[2] Deciding that it does not, we sustain the preliminary objections.

## LEGISLATIVE BACKGROUND

### 1. The Parking Authority Law.

Although the legislative background of the Parking Authority Law has been aptly summarized in earlier cases,[3] a brief historical review is material to understanding the issues in the present case. The General Assembly enacted the Parking Authority Law in 1947 in response to the growing demand for off-street parking in the urban areas of the Commonwealth following World War II, a phenomenon viewed as a statewide problem impacting those residing inside and outside the affected cities. The Parking Authority Law enabled cities, boroughs, and first class townships to create parking authorities in order to provide, administer, and collect revenue from various types of parking facilities.[4] Any parking authority created under this enabling act is not considered a municipal instrumentality but, instead, constitutes a "public body corporate and politic, exercising public powers of the Commonwealth as an agency thereof." 53 Pa.C.S. § 5505. Among the benefits flowing from a parking authority's designation as a state agency was the ability to finance construction projects free from the debt limits applicable to local governments[5] and the right to engage in proprietary or business-type operations from which local governments might otherwise be precluded. *See generally Southeastern Pennsylvania Transportation Authority v. Union Switch & Signal, Inc.*, 161 Pa.Cmwlth. 400, 637 A.2d 662, 664–65 (1994).

The Philadelphia Parking Authority (Authority) was created in 1950 by City ordi-

---

**1.** The Parking Authority Law was enacted as the Act of June 5, 1947, P.L. 458, *formerly*, 53 P.S. §§ 341–356, and it was repealed as part of its codification by the Act of June 19, 2001, P.L. 287.

**2.** Argument before this Court on the preliminary objections was originally scheduled for September 7, 2004, but it was rescheduled to allow the parties to file supplemental briefs on the applicability of the Supreme Court's decision in *City of Philadelphia v. Schweiker*, 579 Pa. 591, 858 A.2d 75 (2004). Argument was heard before this Court *en banc* on March 2, 2005. Subsequent to argument, our Supreme Court rendered its decision in *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 583 Pa. 275, 877 A.2d 383 (2005). This Court directed the filing of second supplemental briefs to address the impact of the Supreme Court's holding on Counts VI and VII of the City's complaint. Second supplemental briefs were filed by the Governor and the Authority on July 25, 2005, and by the City and Mayor on August 25, 2005.

**3.** *See, e.g., Schweiker*, 579 Pa. 591, 598, 858 A.2d 75, 79 n. 3 (2004) (citing *City of Philadelphia v. Philadelphia Parking Authority*, 568 Pa. 430, 441, 798 A.2d 161, 168 (2002) (Saylor, J., concurring); *id.*, at 449–52, 798 A.2d at 173–75 (Zappala, C.J., dissenting); *City of Philadelphia v. Philadelphia Parking Authority*, 837 A.2d 1267, 1268–69 (Pa.Cmwlth. 2003)).

**4.** *See generally* 53 Pa.C.S. § 5504.

**5.** *See* PA. CONST. art. IX, §§ 10, 12; the act frequently referred to as Local Government Unit Debt Act, 53 Pa.C.S. §§ 8001–8285.

nance adopted pursuant to the Parking Authority Law. Initially, the Authority only operated off-street parking garages. These operations continue to the present, and are carried out through leases with the City.[6]

The Parking Authority Law was amended in 1982 to allow cities to delegate certain on-street parking functions to parking authorities. Some of these functions, such as issuing parking tickets and collecting money from parking meters, are revenue-producing. This revenue is required to be distributed back to the municipality as provided by ordinance or resolution.[7] Consistent with this amendment to the Parking Authority Law, the City, in 1983, enacted an ordinance delegating to the Authority much of the City's on-street parking services, which previously had been handled by multiple departments of the City.[8] The City and the Authority executed an "Agreement of Cooperation" under which the Authority administers the City's system of on-street parking.[9] The net revenues collected by the Authority from on-street parking have been used by the City for its operations.

Throughout its existence, the Authority has issued numerous tax-exempt long-term bonds, some of which are outstanding, to finance parking-related development projects within the City and at the Airport. The City has served as guarantor on the bonds in the event of a default by the Authority. The City made this guarantee knowing that it would have revenue from the parking service contract; the bondholders were also made aware of this revenue stream to the City. When the guarantee was made and the service contracts were executed, the City was in a position to control the risks presented by these contractual relationships because, in effect, the City controlled the Authority. Until recently, the Authority's five-member governing board was appointed by the Mayor. At issue in the present action are three amendments to the Parking Authority Law, Act 22 and Acts 8 and 9, which changed the extent of the City's control over the Authority.

## 2. Act 22.

The Act of June 19, 2001, P.L. 287, No.2001-22 (Act 22) was signed into law by then-Governor Thomas Ridge.[10] Act 22 added a provision to the Parking Authority Law—applicable only to cities of the first

6. In particular, the City leases to the Authority the land and buildings necessary for the Authority to operate parking garages and surface lots within the City and at the Philadelphia International Airport. The rent paid by the Authority to the City from parking facility revenues has amounted to approximately $21,500,000 per year for the past several years. Most of these revenues are generated by parking facilities located at the Airport, which were built on land owned by the City and financed primarily through bond issues.

7. 53 Pa.C.S. § 5510(a)(4). *See infra* note 26.

8. The on-street parking functions included installing and maintaining parking meters, promulgating on-street parking regulations, installing signage, issuing parking permits, collecting parking meter receipts and fines, issuing parking tickets, and booting and towing illegally parked vehicles. These functions were performed by, *inter alia*, the City's Streets Department, Police Department, Department of Licenses and Inspection, and Revenue Department.

9. The first Agreement entered into in April 1983 was renewed by the City for a second ten-year term in 1993.

10. Act 22, *inter alia*, codified the Parking Authority Law at Sections 5501 through 5517 of Title 53 of the Pennsylvania Consolidated Statutes, 53 Pa.C.S. §§ 5501–5517. *See City of Philadelphia v. Commonwealth*, 575 Pa. 542, 581–584, 582 n. 21, 838 A.2d 566, 590–92, 591 n. 21 (2003)(explaining the process of statutory codification).

class—supplanting the mayor's power to appoint the Authority's governing board by placing that appointment authority in the governor.[11] Act 22 also required the Authority to transfer up to $45 million of its retained earnings to the Philadelphia School District and to make similar subsequent annual transfers based upon the availability of earnings. 53 Pa.C.S. § 5508.1(q).[12]

The City filed a complaint in this Court's original jurisdiction against then-Governor Mark Schweiker seeking a declaration that Act 22 unconstitutionally infringed upon Philadelphia's Home Rule Charter and violated certain "statutory pledges" that the City would retain control over the Authority until all bonds were fully met and discharged.[13] Governor Schweiker and the Authority filed preliminary objections in the nature of a demurrer to all counts of the City's complaint. This Court sustained the preliminary objections, and the Pennsylvania Supreme Court affirmed. *City of Philadelphia v. Schweiker*, 817 A.2d 1217 (Pa.Cmwlth.2003), *aff'd*, 579 Pa. 591, 858 A.2d 75 (2004). While the Supreme Court appeal was pending, the City notified the Authority of its intent to terminate the Agreement of Cooperation as of March 31, 2004, and to reassume re-

sponsibility for all on-street parking functions.

## 2. Acts 8 and 9.

Following the City's announcement that it intended to terminate the Agreement of Cooperation, the General Assembly passed two statutes further amending the Parking Authority Law. The first, the Act of February 9, 2004, P.L. 65, No.2004–8 (Act 8),[14] required the City to continue to use the Authority to handle on-street parking and to transfer to the School District, on an annual basis, the maximum portion of on-street parking revenues deemed available by the Authority's Board. Act 8 made no provision for the expenses of the Authority, including the need to make interest payments to bondholders.

While Act 8 awaited the signature of the Governor, the General Assembly passed a second statute, the Act of February 10, 2004, P.L. 69, No.2004–9 (Act 9), which repealed the aforementioned provisions of Act 8 and extended the Agreement of Cooperation until March 31, 2014, effectively nullifying the termination notice given by the City to the Authority. Additionally, Act 9 provided for annual transfers of $25

**11.** Although the original five members of the board continued to serve out their terms, the number of members was immediately increased to eleven, with the six additional members appointed by the Governor. The five original members' positions were then phased out as their terms expired, leaving the board comprised of the six gubernatorial appointees. 53 Pa.C.S. § 5508.1(e).

**12.** Subsequently, 53 Pa.C.S. § 5508.1(q) was repealed by Section 3 of the Act of July 16, 2004, P.L. 758. This repeal was occasioned by the addition of 53 Pa.C.S. § 5508.1(q.1), which effectively replaced 53 Pa.C.S. § 5508(q).

**13.** Counts I and IV of the City's complaint, which was the subject of *Schweiker*, raised

home rule challenges. In Counts II and III, the City averred that it was the beneficiary of "statutory pledges" contained in Sections 12 and 13 of the Parking Authority Law, 53 Pa.C.S. §§ 5512(b), 5513(a). *See infra*, note 25 and accompanying text. Counts V through IX asserted various constitutional claims, *i.e.*, that Act 22 impaired certain contractual obligations of the City, constituted a special or local law that was enacted without proper notice, improperly delegated municipal power to a special commission, and was enacted as part of a bill containing more than one subject.

**14.** 75 Pa.C.S. § 6109(g), *repealed by* Section 3 of the Act of Feb. 10, 2004, P.L. 69, No. 9.

million of the *net* on-street parking revenues to the City, and transfer of the revenues in excess of $25 million to the School District. 53 Pa.C.S. § 5508.1.

## ISSUES PRESENTED

The City initiated the present action on April 19, 2004, challenging the constitutionality of Acts 22 and 9.[15] Specifically, in Count I of its petition, the City asserts that Act 22, as amended by Act 9, violates Pennsylvania law guaranteeing home rule to the City. In Count II, the City asserts that Act 22, as amended by Act 9, breaches certain "statutory pledges" contained in the Parking Authority Law. In Count III, the City asserts that Act 22 was enacted in violation of Article III of the Pennsylvania Constitution, which, *inter alia*, prohibits legislation from containing more than one subject. In Count IV, the City contends that Act 9 violates the City's right to home rule. In Count V, the City asserts that Act 9 breaches another "statutory pledge" found in Section 10 of the Parking Authority Law. Counts VI and VII assert that Act 9 violates the requirements in Article III of the Pennsylvania Constitution that each bill be read three times in each house and that the original purpose not change. Finally, in Count VIII, the City argues that should this Court overturn Act 9 we should also find invalid those provisions of Act 8 repealed by Act 9.

In their preliminary objections,[16] the Governor and the Authority assert that the City's complaint fails to state a cause of action based upon alleged violations of: the Home Rule doctrine, "statutory pledges," or the Pennsylvania Constitution. We consider the arguments and positions of the parties presented on each of these three legal questions.[17]

## HOME RULE

On the issue of home rule, the City asserts in Counts I and IV of the

15. The City raises constitutional challenges to both Acts 8 and 9, which it argues are distinct from the challenges it raised to Act 22 in *Schweiker*. Substantively, the City only addresses Act 9 because it effectively repealed Act 8. The City maintains, however, that if Act 9 is invalidated the provisions of Act 8 will be "unrepealed" and its challenges to Act 8 will remain viable. City's Brief in Opposition to Preliminary Objections at 13. Our analysis focuses primarily on Act 9, but we acknowledge that the substantive issues related to both Acts 8 and 9 are indistinguishable and that resolution of the legal effect of Act 9 resolves any challenges by the City to Act 8.

16. Respondents also invoked the doctrine of *lis pendens* to stay the present action pending the outcome of the City's appeal of *Schweiker* to the Supreme Court. The decision of the Supreme Court on September 22, 2004, rendered this objection moot. The Governor individually asserts that he is not a proper party to claims involving Act 9 because he is not charged with enforcement of those amendments. In light of our ultimate disposition of this matter, we need not consider this specific objection.

17. In considering whether to sustain preliminary objections in the nature of a demurrer, this Court must accept as true all well-pleaded allegations of material fact and all inferences reasonably deducible therefrom. *Stone and Edwards Insurance Agency, Inc. v. Department of Insurance*, 151 Pa.Cmwlth. 266, 616 A.2d 1060, 1063 (1992). We need not accept as true conclusions of law, unwarranted inferences from facts, argumentative allegations or expressions of opinion. *Commonwealth, Department of Public Welfare v. Portnoy*, 129 Pa.Cmwlth. 469, 566 A.2d 336, 338 (1989). The test is whether it is clear from all of the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish the right to relief. *Firing v. Kephart*, 466 Pa. 560, 563, 564, 353 A.2d 833, 835 (1976). A demurrer will not be sustained unless the face of the complaint shows that the law will not permit recovery, and any doubts should be resolved against sustaining the demurrer. *Gaster v. Township of Nether Providence*, 124 Pa.Cmwlth. 595, 556 A.2d 947, 949 (1989).

Complaint that Act 22, as implemented by Act 9, divests the City of control over on-street parking in Philadelphia [18] and, therefore, violates the City's Home Rule rights under the Pennsylvania Constitution, the First Class City Home Rule Act of 1949 (Home Rule Act),[19] the Philadelphia Home Rule Charter,[20] and ordinances of the Philadelphia City Council. Compl. ¶¶ 64, 77. We disagree.

■ Although the right to home rule is guaranteed by the Pennsylvania Constitution,[21] that right is effected through enabling legislation such as the Home Rule Act, which identifies those powers that fall within the category of home rule powers and those that do not. Section 17 of the Home Rule Act grants to first class cities that adopt a home rule charter, *i.e.*, Philadelphia, "complete powers of legislation and administration in relation to its municipal functions." 53 P.S. § 13131. This grant of powers is made subject to limitations, restrictions and regulations enumerated in Section 18 of the Home Rule Act, 53 P.S. § 13133. *See Schweiker*, 579 Pa. at 605, 858 A.2d at 84. Stated otherwise, these limitations identify those activities that do not constitute home rule municipal functions. One such non-home rule municipal function is the undertaking of proprietary activities.

The City acknowledges that Section 18 prevents it from engaging in proprietary businesses, except as authorized in separate non-home rule legislation. However, the City argues that because Section 17 of

the Home Rule Act grants the City power over all municipal functions, any function it delegates to an authority, such as parking, must be a municipal function. The argument is circular. It flows from a false premise, namely, that all the City's powers flow from the Home Rule Act. In fact, the City's authority to run a parking business stems from the Parking Authority Law, not from the Home Rule Act. As explained in *Schweiker*, the Authority is not a department of the City. Rather, the Parking Authority Law, a non-home rule enactment, is the source of the Authority's power, 53 Pa.C.S. § 5504(a), and the source of the City's power to delegate parking functions to the Authority, 53 Pa.C.S. § 5505(a).

The Authority is a Commonwealth agency, empowered to engage exclusively in commercial, *i.e.*, proprietary functions; its "business" is generating revenue from parking cars on streets and in garages. Because Section 18 of the Home Rule Act, 53 P.S. § 13133, prohibits the city from engaging in proprietary activities, the Supreme Court rejected the City's argument in *Schweiker* that exercising control over an authority that performs proprietary functions falls within the City's home rule powers. The Supreme Court reasoned that even if the City's appointment power fell "within the scope of the general home rule powers granted by the Home Rule Act when it was enacted, it does not follow that the Legislature could not remove such powers at a later date." *Schweiker*, 579

---

18. There is no authority for the City's premise that parking is an inherently municipal function. Parking is not listed in the General Municipal law under general power, street and highway, health and safety or any other subheading. Act of June 25, 1895, P.L. 275, *as amended*, 53 P.S. §§ 101–70001. Parking is also not listed in any of the subsections of the Home Rule Act. Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. §§ 13101–13156.

"On-street parking" and "off-street parking" are only defined in the Parking Authority Law, 53 Pa.C.S. § 5503.

19. Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. §§ 13101–13157.

20. *See* 351 Pa.Code §§ 1.1–100–12.12–503.

21. *See* PA. CONST. art. IX, § 2.

Pa. at 610, 858 A.2d at 87. In other words, the General Assembly "retains express constitutional authority to limit the scope of any municipality's home rule governance." *Id.* The Court further explained that these limitations may be imposed by legislation *extrinsic* to the Home Rule Act, particularly where both statutes, *i.e.*, the Home Rule Act and Act 22, pertain to first class cities. Finally, the Supreme Court held that "to the extent there is any conflict between these two enactments, Act 22 limits the City's home rule rights in a manner that is consistent with Article IX, Section 2 of the Pennsylvania Constitution." *Id.* at 612, 858 A.2d at 88. Accordingly, the Supreme Court held that this Court acted properly in sustaining preliminary objections to the City's claims that Act 22 violated Philadelphia's Home Rule Charter.

In its first supplemental brief to this Court,[22] the City concedes that the *Schweiker* decision precludes it from challenging, on home rule principles, the transfer from the mayor to the governor of the power to appoint the Authority's board members. The City also concedes that *Schweiker* clarifies that the City's home rule powers do not extend to proprietary functions, such as off-street parking. Nevertheless, the City argues that *Schweiker* is not dispositive of its Act 9 challenges. Essentially, the City argues that managing on-street parking, unlike off-street parking, does implicate home rule powers. By extending the Agreement of Cooperation,

Act 9 interferes with the City's home rule power, an issue not addressed by the Supreme Court's holding in *Schweiker*.

The threshold question in *Schweiker* was whether the appointment of members to the Authority's board required the exercise of a home rule power. *Schweiker*, 579 Pa. at 606–07, 858 A.2d at 84–85. The Supreme Court held that it did not. The threshold question for this Court is very similar, *i.e.*, whether the responsibility to service on-street parking activities is a core municipal function that is governed exclusively by home rule. We think not.

The Parking Authority Law expressly authorized the Authority to engage in managing the revenue-producing project of on-street parking in Philadelphia. Since at least 1982, then, this part of on-street parking has been understood to be a proprietary function, as opposed to the kind of municipal function governed exclusively by the exercise of home rule powers. As the Supreme Court observed in *Schweiker*, it is "difficult to argue that exercising control over an authority which performs these [parking] functions is nonetheless included within such [home rule] powers." *Schweiker*, 579 Pa. at 610, 858 A.2d at 87. Following this same logic, *Schweiker* requires us to conclude that the on-street parking duties assigned to the Authority are not municipal functions governed by home rule.

Act 9 did not negate the City's control of a purely municipal function.[23]

**22.** *See supra* note 2 (explaining the filing of briefs and supplemental briefs in this matter).

**23.** The dissent contends that Act 9 violates Article III, Section 31 of the Pennsylvania Constitution, which prohibits the General Assembly from delegating municipal functions to a private entity. First, this constitutional issue was not raised by any of the parties. Second, Act 9 does not delegate *municipal* functions to a private entity, in derogation of

Article III, Section 31. In any case, as conceded by the dissent, a delegation to execute a law is permissible; it is the power to make a law that cannot be delegated. In 1983, the City, by ordinance, gave the Parking Authority the power to execute, *i.e.*, administer, the City's on-street parking, and entered into a Cooperation Agreement to implement that delegation. Act 9 extended that contract. Act 9 did not divest the City Council of the

The on-street parking activities governed by the Parking Authority Law are proprietary activities that fall outside the reach of home rule power, as held in *Schweiker*.[24] The Supreme Court determined in *Schweiker* that "Act 22 limits the City's home rule rights in a manner that is consistent with the Pennsylvania Constitution." *Id.* at 612, 858 A.2d at 88. *Id.* at 612, 858 A.2d at 88. Thus, the City's Charter must give way where there is a conflict between it and amendments to the Parking Authority Law. This reasoning applies with equal force to the Act 9 amend-

ments. Accordingly, we sustain the preliminary objections to Counts I and IV of the Petition.

**STATUTORY PLEDGES**

 We turn next to Counts II and V of the City's complaint, in which it asserts that Acts 22 and 9 violate certain "statutory pledges" in the Parking Authority Law. Specifically, the City argues that Act 22, as further implemented and confirmed by Act 9, breached "statutory pledges" in Sections 12 and 13 of the Parking Authority Law.[25] The City also argues that Act 9 breached a

---

ability to legislate on the subject of on-street parking that does not involve the proprietary aspects of on-street parking.

The dissent reads Act 9 to give the Authority a legislative veto, relying on the language that "[t]he [A]uthority and the [C]ity, by mutual consent, may modify the system of on-street parking regulation to the extent permitted by applicable law." The Parking Authority Law makes it clear that "on-street parking regulation" involves acts of administration, supervision and enforcement, not legislative acts. 53 Pa.C.S. § 5505(d)(21). Specifically, those authorized acts include conducting research, issuing tickets, collecting fines from parking ticket scofflaws and booting and towing illegally parked vehicles. 53 Pa.C.S. § 5505(d)(21)(i)-(v). We read the language in Act 9 found offensive by the dissent to require the Authority to consult the City about the aspects of on-street parking administration listed in Section 5505(d)(21)(i)-(v). It may be that City Council may not pass ordinances that conflict with Act 9, but this does not implicate Article III, Section 31. This is a simple matter of preemption on one narrow subject, *i.e.*, "on-street parking regulation." 53 Pa.C.S. § 5505(d)(21). In any case, the Authority has not attempted to veto an act of City Council. The mere possibility of that event does not give rise to a cause of action. Stated otherwise, the claim is not ripe for our review because it is not presented here.

24. Section 18 of the Home Rule Act provides in relevant part:

No city shall exercise any powers or authority beyond the city limits except such as are conferred by an act of the General Assem-

bly, and *no city shall engage in any proprietary or private business except as authorized by the General Assembly*. Notwithstanding the grant of powers contained in this act, no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are—

\* \* \*

(b) Applicable in every part of the Commonwealth.
(c) Applicable to all the cities of the Commonwealth, including, but not limited to, those acts providing for the disability compensation of police officers and firefighters.
53 P.S. § 13133 (emphasis added).

25. Sections 5512(b) and 5513(a) of the Parking Authority Law contain the following provisions:

(b) **Limitation.**—The authority is not authorized to do anything which will impair the security of the holders of the obligations of the authority or violate agreements with them or for their benefit.
53 Pa.C.S. § 5512(b).
(a) **Power of authorities.**—The Commonwealth pledges to and agrees with any person, firm or corporation or Federal agency subscribing to or acquiring the bonds to be issued by the authority for the construction, extension, improvement or enlargement of a project or part thereof that the Commonwealth will not limit or alter the rights vested by this chapter in the authority until all bonds and the interest on them are fully met and discharged.
53 Pa.C.S. § 5513(a).

"statutory pledge" in Section 10 of the Parking Authority Law.[26] The City strains in its argument that *Schweiker,* which specifically addressed the issue of "statutory pledges," is not dispositive of the City's present claims.

In *Schweiker,* the Supreme Court rejected the City's theory that the legislature can make "pledges" that immunize a statute from any later amendments. With respect to the so-called "pledge" in Section 12 of the Parking Authority Law, the Court noted that "[w]hile this provision articulates a restriction on the Parking Authority's powers as they existed under the prior version of the statute, it does not constitute a pledge on the part of the Legislature never to alter those powers in the future." *Schweiker,* 579 Pa. at 614, 858 A.2d at 89 (citing *In re Marshall,* 363 Pa. 326, 337, 69 A.2d 619, 626 (1949) ("Legislative power is the power to make, alter, and repeal laws.")).[27] Further, the Supreme Court determined that the General Assembly's constitutional authority to regulate home rule governance includes the ability to limit home rule powers by legislation extrinsic to the Home Rule Act.

Amendments to the Parking Authority Law are examples of such limitations.

We find no merit in the City's claim that "pledges" in Sections 10, 12 and 13 of the Parking Authority Law are legally enforceable promises by the General Assembly never to alter the powers granted to the City in that statute. Such a pledge, if found, would itself violate one of the most basic principle of democratic rule, *i.e.,* that one legislative body may not bind a successor legislative body. *Mitchell v. Chester Housing Authority,* 389 Pa. 314, 321, 132 A.2d 873, 877 (1957). Accordingly, the preliminary objections to Counts II and V are sustained.[28]

## CONSTITUTIONAL CHALLENGES

### 1. Single Subject.

The City asserts in Count III of its petition that Act 22 was unconstitutionally enacted as a bill containing more than a single subject, in violation of the "single subject" requirement of Article III, Section 3 of the Pennsylvania Constitution. The City raised this same issue in

**26.** Section 5510(a)(4) of the Parking Authority Law provides as follows:

> (4) In the case of money collected or received by the authority on behalf of a municipality under section 5505(d)(21) (relating to purposes and powers), the money shall be pledged to the use of the municipality and disbursed to the municipality as provided by ordinance or resolution.

53 Pa.C.S. § 5510(a)(4).

**27.** The *Schweiker* court also found that the now-repealed "retained earnings" provision of Act 22 gave primacy to the bondholders' interest and, therefore, Act 22 did not constitute a breach of Section 12. The Court reasoned that Act 22 did not, in fact, impair the interests of the bondholders or place the City at a greater risk as guarantor of the bonds because the monies "available" for the School District are net revenues and do not include any funds needed to meet the Authority's out-

standing obligations, including those to the bondholders. The City focuses upon this specific determination as a factual basis for distinguishing *Schweiker* from the present case. The City ignores the general proposition, reaffirmed in *Schweiker,* that the General Assembly may change existing laws regardless of whatever powers and protections were granted therein. *See also Commonwealth Association of School Administrators v. Board of Education, School District of Philadelphia,* 740 A.2d 1225, 1231 (Pa.Cmwlth.1999), (noting "that rights granted under a statute are not contractual in nature ... and no constitutional rights are implicated if they are changed or eliminated.").

**28.** In view of the disposition of the substantive issues, it is not necessary to address the Governor's argument that he is not a proper party, or the procedural claims raised in Counts VI and VII.

*Schweiker;* however, the Supreme Court determined that the claim was abandoned on appeal. Notwithstanding the fact that no final decision on the merits of this issue was ever rendered, the City concedes in its first supplemental brief to this Court that *Schweiker* is dispositive of the "single subject" claim. Therefore, since the City has once again abandoned this issue, we sustain the preliminary objection to Count III.

## 2. Original Purpose.

■ In Count VI, the City asserts that the enactment of Act 9 violated Article III, Section 1 of the Pennsylvania Constitution,[29] which bars the alteration of a bill to the extent it changes the bill's original purpose. In support, the City notes that the original purposes of House Bill 1785 (Act 9) were: (1) to revise the residency requirement for members of parking authorities; (2) to clarify the voting rights of police officers; and (3) to authorize municipalities to remove fluoride from their public water supplies. Compl. ¶ 57. House Bill 1785 was considered for a third and final time and passed by both the House and Senate on February 9, 2004. On that day, the bill was amended to provide (1) that the Authority would continue to administer and enforce on-street parking regulations in the City, and (2) that net parking revenues would be directed to the District, thereby repealing sections of Senate Bill 279 (Act 8). The provisions related to police officers' voting rights and fluoridation of public water were deleted. Compl. ¶ 58; H.B. 1785, 2003 Leg., Reg. Sess. (Pa.2004).

■ Our Supreme Court recently addressed the original purpose rule in *Penn-* *sylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth,* 583 Pa. 275, 877 A.2d 383 (2005), and announced a new two-prong inquiry for determining whether legislation violates the rule. First, a reviewing court must compare the final purpose of legislation to its original purpose and determine whether there has been an alteration or amendment of the original purpose. *Id.* at 317–18, 877 A.2d at 408–409. Second, a court must consider whether, in its final form, the title and contents of the bill are deceptive. *Id.* at 318, 877 A.2d at 409.

The linchpin of the first prong of the analysis is defining the original purpose of a bill. This has been explained by the Supreme Court as follows:

Regarding the determination of the original purpose of the legislation, we recognize the realities of the legislative process which can involve significant changes to legislation in the hopes of consensus, and the "expectation" that legislation will be transformed during the enactment process. Furthermore, *our Court is loathe to substitute our judgment for that of the legislative branch* under the pretense of determining whether an unconstitutional change in purpose of a piece of legislation has occurred during the course of its enactment. *For these reasons, we believe that the original purpose must be viewed in reasonably broad terms.* ...
[I]t is helpful for a reviewing court to hypothesize, based upon the text of the statute, as to a reasonably broad original purpose. Given this approach of considering a reasonably broad original purpose, the General Assembly is given full opportunity to amend and even expand a

---

**29.** The Pennsylvania Constitution, Article 3, Section 1, entitled "Passage of laws" states: No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose.

bill, and not run afoul of the constitutional prohibition on an alteration or amendment that changes its original purpose.

*Id.* (citations omitted) (emphasis added).

Applying the foregoing principles, we find that the original purpose of Act 9, viewed in reasonably broad terms, included the regulation of municipal parking authorities. As ultimately enacted, Act 9 provided that the Authority would continue to enforce and administer on-street parking in Philadelphia under the terms of the existing Agreement of Cooperation until 2014. The final version of Act 9 is still within its broad original purpose of the regulation of municipal parking authorities.[30] We will not substitute our judgment for the General Assembly's in this regard. The first prong of the inquiry is satisfied.

Turning to the second prong, we must determine whether, in its final form, the title and contents of the bill were deceptive. The final title of a bill is not deceptive if it "placed reasonable persons on notice of the subject of the bill." *Id.* at 318, 877 A.2d at 409. The final title for Act 9, Senate Bill 780, printer's number 1186, states:

> An Act amending Title 53 (Municipalities Generally) of the Pennsylvania Consolidated Statutes, codifying the Municipal Authorities Act of 1945 and the Parking Authorities Law; revising provisions on purposes and powers of municipal authorities and residency requirements for municipal authority governing bodies; further providing for the organization and duties of governing bodies of parking authorities in cities of the first class; and making repeals.

S.B. 780, 2001 Leg., Reg. Sess. (Pa.2001). There is nothing deceptive about this title. It puts reasonable persons on notice that the legislature is amending the Parking Authority Law and changing "the organization and duties of parking authorities in first class cities," *i.e.*, Philadelphia.

Having found that Act 9 did not violate Article III, Section 1 of the Pennsylvania Constitution, we sustain the preliminary objection to Count VI.

### 3. Three Readings.

In Count VII of its complaint, the City asserts that Act 9 violates Article III, Section 4 of the Pennsylvania Constitution requiring that "[e]very bill shall be considered on three different days in each House." Compl. ¶ 95. The City argues that, because of the last-minute changes described above, the form of House Bill 1785 (Act 9) considered and adopted was fundamentally different from the form of the bill introduced in the legislature.[31] Because of these differences, the City contends that Act 9 was not considered on three separate occasions. Compl. ¶ 98. We disagree.

Article III, Section 4 does not require that each time a bill is amended, it must, again, be read three times. As this Court has explained:

> [w]hen either the House or the Senate places amendments to legislation ema-

---

30. We note that it would be unduly burdensome to expect that the purpose of a final bill be stated in precisely the same terms used to describe its purpose when first introduced. Such a requirement would make it impossible to amend a bill.

31. In its original form, House Bill 1785 (Act 9), considered three topics, one of which was the Parking Authority Law. The Senate amended House Bill 1785 to make additional amendments, *i.e.*, required continuation of the Authority's administration of on-street parking in Philadelphia and to change the allocation of revenue derived therefrom.

nating in the other chamber, those amendments do not constitutionally require another separate three days of separate consideration.... [I]f it were otherwise and both chambers were constitutionally required to consider the conference amendments on three separate days, the entire legislative process would be bogged down to snail-paced process.

*Fumo v. Pennsylvania Public Utility Commission*, 719 A.2d 10, 15 (Pa.Cmwlth. 1998). This case illustrates our point in *Fumo*. The record demonstrates, and the City admits, that House Bill 1785 (Act 9) was considered on three different days in the House and on three different days in the Senate.[32] It, therefore, passes constitutional scrutiny even though the Senate amendments did not receive a separate three days of consideration in the House of Representatives.[33] The preliminary objection to Count VII is sustained.[34]

## CONCLUSION

In accordance with the above-referenced analysis, we sustain all preliminary objections and dismiss the Complaint.

## ORDER

AND NOW, this 20th day of December, 2005, the preliminary objections in the

---

**32.** House Bill 1785 was considered by the House on July 7, 2003; July 8, 2003; and on September 30, 2003 it was considered and passed. It was considered by the Senate on November 25, 2003; December 9, 2003; and on February 9, 2004 it was considered and passed.

**33.** Alternatively, we note that in *Fumo* this Court determined that a violation of Article III, Section 4 is directly tied to a violation of Article III, Section 1. *Fumo*, 719 A.2d at 14. Because we have concluded that Act 9 was not enacted in violation of Article III, Section 1, it follows that there was no violation of Article III, Section 4.

**34.** The City has requested in Count VIII that this Court rule that the repealed provisions of

above-captioned matter are hereby SUSTAINED and the complaint is DISMISSED.

## CONCURRING AND DISSENTING OPINION BY Judge PELLEGRINI.

This case has its origin in the passage of Act 22 which, among other things, changed who appointed a majority of the Board of the Philadelphia Parking Authority (Parking Authority) from the Mayor of the City of Philadelphia (City) to various state officials acting through the Governor. Affirming this court, our Supreme Court in *Philadelphia v. Schweiker*, 579 Pa. 591, 858 A.2d 75 (2004), held that change did not violate the home rule provisions of the Pennsylvania Constitution because authorities were "agencies of the Commonwealth" and the General Assembly could have its way with them. What is at issue in this case, however, is whether the General Assembly, by passing Act 9, can have its way with a home rule municipality by vesting in an unelected Parking Authority Board discretion regarding on street parking laws of the City of Philadelphia and how those laws should be enforced. Because Act 9 violates the Pennsylvania Constitution, I respectfully dissent.[1]

---

Act 8 shall remain repealed or declared void in the event that Act 9 is found to be unconstitutional. Having found the enactment of Act 9 to be constitutional, it is unnecessary to address the preliminary objections to Count VIII.

**1.** In *Schweiker*, our Supreme Court also held that there was no violation of specific statutory pledges because rights granted under a statute are not contractual in nature ... and no constitutional rights are implicated if they are changed or eliminated. There is no violation of Article III, Section 3 of the Constitution regarding the single subject rule because the two subjects—municipal authorities and parking authorities—were two subjects that were inextricably intertwined. Similar chal-

While the *Schweiker* case was pending before the Supreme Court, Act 8[2] was passed by the General Assembly relative to the Parking Authority Law.[3] This required the City to continue using the Parking Authority for on-street parking enforcement to transfer to the School District of the City of Philadelphia (School District) the maximum portion of on-street parking revenues available by the Parking Authority. While Act 8 awaited the Governor's signature, on February 9, 2004, the General Assembly further amended the Parking Authority Law by enacting Act 9, 53 Pa.C.S. § 5508.1(q.1)[1], which *authorized the PPA to enforce and administer a system of on-street parking* in the City until March 31, 2014. *Act 9 repealed the above-mentioned provisions of Act 8* and required the Parking Authority to carry out these responsibilities consistent with the terms of an Agreement of Cooperation between the Parking Authority and the City that were due to expire on January 1, 2004. Act 9 also provided that the Parking Authority would *transfer a specified amount* of revenue from the operation of the system of on-street parking regulation to the City, and further required the Parking Authority to transfer the excess of that amount to the School District. Unlike *Schweiker*, then, which involved the transfer of the appointment of authority over an authority held to be a commonwealth agency, Act 9 involved placing burdens on the City and the exercise of its police power.

The City and the Mayor then filed a petition for review with this Court raising statutory and constitutional challenges to Act 9, including several counts which allege that Act 9 violates various provisions of the Constitution regarding home rule as well as alleging that it constitutes special legislation. Regarding Act 9, the Parking Authority and the Governor filed preliminary objections alleging, among other things, that its actions did not violate the Pennsylvania Constitution.

The majority grants those preliminary objections and dismisses the home rule counts, reasoning that when the City delegated the responsibility, admittedly local, municipal on-street parking functions to the Authority, an agency of the Commonwealth, an entity engaged exclusively in proprietary functions, *i.e.*, financing and managing of various revenue-producing projects that are not considered to be part of core governmental activities and are not within the ambit of protections afforded to home rule municipalities under the Pennsylvania Constitution. It states:

> The threshold question for this Court is very similar, *i.e.*, whether the responsibility to service on-street parking activities is a *core municipal function*[4] that is governed exclusively by home rule. We think not.

> The Parking Authority Law expressly authorized the Authority to engage in managing the revenue-producing project of on-street parking in Philadelphia. Since at least 1982, then, this part of on-street parking has been understood to be a proprietary function, as opposed to

---

lenges have been raised in this case, and I join with the majority as to the resolution of those issues.

**2.** 75 Pa.C.S. § 6109(g), *repealed by* Section 3 of the Act of February 10, 2004, P.L. 69, No. 9 (Act 2004–9).

**3.** Act of June 5, 1947, P.L. 458, *formerly* 53 P.S. §§ 341–356, repealed by Act of June 19, 2001, P.L. 287, No. 22 @ 3. The Law is now found at 53 Pa.C.S. §§ 5501–5517.

**4.** No where is the term "core municipal function" used in either Article 3, § 31 or Article 9, § 2 of the Pennsylvania Constitution. *See, infra.*

the kind of municipal function governed exclusively by the exercise of home rule powers. As the Supreme Court observed in *Schweiker*, it is "difficult to argue that exercising control over an authority which performs these [parking] functions is nonetheless included within such [home rule] powers." *Schweiker*, 579 Pa. at 610, 858 A.2d at 87. Following this same logic, *Schweiker* requires us to conclude that the on-street parking duties assigned to the Authority are not municipal functions governed by home rule.

Act 9 did not negate the City's control of a purely municipal function. The on-street parking activities governed by the Parking Authority Law proprietary activities that fall outside the reach of home rule power, as held in *Schweiker*. The Supreme Court determined in *Schweiker* that "Act 22 limits the City's home rule rights in a manner that is consistent with the Pennsylvania Constitution." *Id.* at 612, 858 A.2d at 88. Thus, the City's Charter must give way where there is a conflict between it and amendments to the Parking Authority Law. (Internal footnotes omitted.)

(Slip opinion at 12–13.)

From the above, even the majority does not dispute that when a city performs on-street parking regulation and enforcement, it is a governmental function. However, once that function is turned over to a parking authority, the majority finds that function is somehow transformed into a proprietary one because a parking authority can only carry out proprietary functions. Through this legerdemain, the majority concludes that because a home rule city is prohibited from engaging in proprietary functions unless authorized by the state, the City can no longer engage in parking enforcement because it is now a proprietary function, and it cannot engage

in on-street parking regulation and enforcement unless the General Assembly gives it permission which, in this case, was taken away by Act 9. Accordingly, because the City can no longer engage in on-street parking regulation, the majority holds that Act 9 does not impinge on the City's home rule.

What this holding ignores is that what constitutes a governmental function is not determined by the entity that carries out that function, but by what comprises the basic nature of the function. (No one would claim if a war was fought with mercenaries that makes a war a proprietary function.) Control of the public right-of-way, i.e., to lay out, pave, maintain, control and police its streets and sidewalks is not only a governmental function but "the" governmental function performed by any municipality. On-street parking regulation is one part of the governmental municipal function included as part of its police power to control traffic. *Love v. Borough of Stroudsburg*, 528 Pa. 320, 597 A.2d 1137 (1991); *Laubach v. City of Easton*, 347 Pa. 542, 32 A.2d 881 (1943).

The General Assembly has authorized all municipalities to enforce the municipal function over on-street parking regulation by entering into an agreement with parking authorities to enforce on-street parking. 53 Pa.C.S. § 5505(21) provides:

Notwithstanding anything to the contrary contained in this chapter, if authorized by resolution or ordinance of the legislative body of the parent municipality, to administer, supervise and enforce an efficient system of on-street parking regulation. This paragraph includes the power:

(i) to conduct research and maintain data related to on-street parking activities;

(ii) to issue parking tickets for illegally parked vehicles;

(iii) to collect on behalf of a municipality rates and other charges, including fines and penalties, for uncontested on-street parking violations;

(iv) to boot or tow a vehicle which is illegally parked or the owner of which is delinquent in payment of previously issued parking tickets; and

(v) to own or lease personal property used in connection with the exercise of any power provided in this paragraph.

Under this provision, though, the ultimate control must remain with the municipality over what are the on-street parking regulations to insure that the parking authority only carries out proprietary functions, the "details of administration," that the municipality has charged it to enforce and, just as important, whether it desires to enter into the arrangement at all.

In Act 9, by adding 53 Pa.C.S. § 5508.1(q.1)(1), which applies only to first-class cities, the General Assembly took away control from the elected officials of the City and its citizens over on-street parking regulation and enforcement, a purely governmental municipal function by vesting within the Parking Authority the power to control that type of regulation. Act 9 did so by requiring Parking Authority approval and consent over ordinances enacted by the Council of the City dealing with on-street parking and agreements to carry out on-street parking enforcement requiring councilmanic resolutions unless agreed to by an unelected Parking Authority Board. This provision provides:

(1) Notwithstanding any contrary provision of Title 75 (relating to vehicles) or this chapter, the authority shall enforce and administer a system of on-street parking regulation in a city of the first class on behalf of the city. The system of on-street parking regulation shall function and be administered pursuant to section 5505(d)(21) (relating to pur-

poses and powers) and the city's ordinances as in **effect January 1, 2004,** as implemented pursuant to an agreement between the authority and the city as in effect on January 1, 2004. In administering the system of on-street parking regulation, the authority shall have the same powers and be subject to the same restrictions as were in effect on January 1, 2004, under the ordinances and agreement. The procedures to be followed in operating the system of on-street parking regulation include the budgetary procedures and the allocation of responsibility between the authority and the city existing on January 1, 2004, under the ordinances and agreement. **The authority and the city, by mutual consent, may modify the system of on-street parking regulation to the extent permitted by applicable law.** The authority and city are authorized to do all acts and things necessary or convenient to implement the provisions of this subsection. (Emphasis added.)

By requiring "mutual consent" over changes in on-street parking regulations, Act 9 unconstitutionally vests absolute veto in an unelected Parking Authority Board giving it the power both to shape and forestall on-site parking legislation over the wishes of the City's citizens who act through its elected representatives on City Council. By usurping the discretion of municipal elected officials on how they intend to enforce local parking laws, which, without cavil, is a municipal function, Act 9 violates Article 3, § 31 of the Pennsylvania Constitution which reads in relevant part:

The General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform

any **municipal function** whatever. (Emphasis added.)

In interpreting this provision, our Supreme Court has said, "[i]f the delegation of power is to make the law, which involves a discretion of what the law shall be, then the power is nondelegable. If the conferred authority is the power or discretion to execute the law already determined and circumscribed, then the delegation is unobjectionable." *Erie Firefighters Local No. 293 of Intern. Association of Firefighters v. Gardner,* 406 Pa. 395, 396, 178 A.2d 691, 694 (adopting the opinion of Judge Laub, 26 Pa. D. & C. 2d 327 (1962)). *See also Wilson v. Philadelphia School District,* 328 Pa. 225, 195 A. 90 (1937). By giving the Parking Authority what is essentially the power to control the actions of the City to carry out its police power over on-site parking, Act 9 does not give the power to the Parking Authority to carry out the "details of administration," but essentially the power to make law over what the on-street parking regulations are and require

a contract to remain in place that does not have legislative approval.[5]

By violating Article 3, § 31 of the Pennsylvania Constitution in this fashion, Act 9 necessarily violates Article 9, § 2 of the Pennsylvania Constitution which provides:

Municipalities shall have the right and power to frame and adopt home rule charters. .... A municipality which has a home rule charter may exercise any power or perform any **function not denied** by this Constitution, by its home rule charter or by the General Assembly at any time. (Emphasis added.)

While the General Assembly can "deny" to a home rule municipality the power to perform any "function," Act 9 does not "deny" the City the power to perform a "function;" instead, it prescribes the way the City has to carry out a function, something not permitted by this provision of the Constitution.

The majority avoids dealing with the language of this provision by magically

5. In footnote 23, the majority makes several points. First, it points out that the City did file a count pointing out that Act 9 violates Article III, Section 31. That is the one point on which we agree. The analysis of that provision is to show that the majority's analysis leads to an unconstitutional result.

In attempting to refute the dissent's analysis, the majority then goes on to state:

We read the language in Act 9 found offensive by the dissent to require the Authority to consult the City about the aspects of on-street parking administration listed in Section 5505(d)(21)(i)-(v). It may be that City Council may not pass ordinances that conflict with Act 9, but this does not implicate Article III, Section 31. This is a simple matter of preemption on one narrow subject, *i.e.,* "on-street parking regulation." 53 Pa.C.S. § 5505(d)(21). In any case, the Authority has not attempted to veto an act of City Council. The mere possibility of that event does not give rise to a cause of action. Stated otherwise, the claim is not ripe for our review because it is not presented here.

The majority confuses the concept of "preemption" with the constitutional prohibition against "unlawful delegation." Act 9 takes no powers away from the City; it still has the power to enact on-street parking regulations. What has changed is that it only has the power to do so with the consent of the non-elected Parking Authority Board.

The majority attempts to get over the constitutional infirmity of Act 9 by attempting to redefine "consent," to mean "consult." When you have to obtain "consent," that means the party who has to give it has veto power which is a far cry from consult, seeking advice, and then doing what you want to do. Because the unelected Parking Authority Board has "veto" power over a governmental function, it is an unconstitutional delegation of a power invested in elected local governmental officials.

The majority then goes on to state that it is not ripe for review. Act 9 takes away governmental powers from the City on how they are going to conduct their affairs. How can it not be ripe for review and how is the City not aggrieved?

changing on-street parking regulation from a governmental function to a proprietary one. It then reasons because the City cannot engage in a proprietary business under Section 18 of the Home Rule Act, 53 P.S. § 13133,[6] which provides that *"no city shall engage in any proprietary or private business except as authorized by the General Assembly"* then on-street parking is not a municipal function, and because it is not a municipal function, home rule cannot be implicated. Even assuming that on-street parking regulation can ever be a proprietary function, this reasoning is flawed for several reasons.

First, the City or, for that matter, the Parking Authority, is not engaging in a proprietary business within the meaning of Section 18 of the Home Rule Act when either of them administers or regulates on-street parking. That provision only forbids home rule municipalities from operating a "proprietary or private business," say, a professional baseball team or own a hotel that is available to the general public. The regulation of on-street parking, with the issuing of tickets or towing of cars, cannot in any way be said to be a proprietary or private business because it is carried out for the public good to regulate traffic.

Second, just because a function is a proprietary one does not mean that it is not a municipal function. "[A] municipal corporation carries out both "governmental" and "proprietary" functions." *City of Philadelphia v. Schweiker*, 579 Pa. 591, 858 A.2d 75, 87 (Pa.2004). Examples of proprietary functions that a municipality carries out are maintaining parks and playgrounds. *DeSimone v. City of Philadelphia*, 380 Pa. 137, 110 A.2d 431 (1955), and the distribution of water, *Helz v. City of Pittsburgh*, 387 Pa. 169, 127 A.2d 89 (1956). Even if on-street parking is a proprietary function, nonetheless, it would still be a municipal

function, Article 9, § 2 of the Pennsylvania Constitution prohibits the General Assembly from directing or interfering how the municipality can carry out that function. Otherwise, home rule means nothing.

Because no matter how you characterize on-street parking—governmental or proprietary—it is still a municipal function with which Act 9 has unconstitutionally interfered.

Accordingly, I respectfully dissent.

Judge SMITH–RIBNER joins in this dissenting opinion.

---

6. Act of April 21, 1949, P.L. 665, *as amended,* 53 P.S. § 13133.